**PEOPLE OF the STATE OF ILLINOIS et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Illinois Central Gulf Railroad Company, Intervening Respondent.**

No. 79–1292.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1979.

Decided Nov. 26, 1979.*

Opinion Jan. 31, 1980.

* This appeal was originally decided by unreported order on November 26, 1979. *See* Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

Thomas F. McFarland, Jr., Chicago, Ill., Gordon P. MacDougall, Washington, D. C., James Weging, Sp. Asst. Atty. Gen., Commerce Comm. Div., Chicago, Ill., for petitioners.

Charles A. Stark, I.C.C., Washington, D. C., for U. S. A. & I. C. C.

Robert D. Kelly, Ill. Central Gulf R. R., Chicago, Ill., for intervening respondent.

Before SPRECHER and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.**

PER CURIAM.

This is a petition to review an order of the Interstate Commerce Commission (ICC) authorizing the Illinois Central Gulf Railroad Company (ICG) to abandon a 26.5 mile segment of railroad between Mason City and Ashland, Illinois. The Attorney General of Illinois, on behalf of the People of the State of Illinois and the Illinois Commerce Commission; three shippers served by this railroad segment; [1] and the Illinois Legislative Director for United Transportation (petitioners) claim that the ICC improperly granted a certificate of public convenience and necessity permitting ICG to abandon this segment of railroad. We affirm the order of the ICC denying the petition for review.

I.

ICG, on October 27, 1976, filed an abandonment application for a 42 mile segment of railroad between Mason City and Jacksonville, Illinois pursuant to section 1a of the Interstate Commerce Act. 49 U.S.C. § 1a (now codified as 49 U.S.C. § 10903).[2]

---

** Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. The three shippers are Menard Service Co., F. S. Services, Inc., and Sohigro Service Corp., a division of Vistron Corp.

2. This section provides in pertinent part:

(1) No carrier by railroad subject to this part shall abandon all or any portion of any of its lines of railroad (hereafter in this section referred to as 'abandonment') and no such carrier shall discontinue the operation of all rail service over all or any portion of

In November 1976, notice of ICG's application to abandon this 42 mile segment was published in five local newspapers and was posted in twelve railroad depots along the affected line. Further, on May 5, 1977, the ICC published a map of ICG's railroad system in the *Federal Register*, specifically identifying the line between Mason City and Jacksonville as the trackage for which an abandonment application had been filed. 42 Fed.Reg. 22981, 22997. The 42 mile proposed abandonment was scheduled for hearing beginning on January 4, 1978. On December 2, 1977 ICG requested permission to amend its application, proposing only to abandon the northernmost 26.5 miles (Mason City to Ashland) (the northern segment), of the 42 mile segment. At a hearing held in January 1978 the Administrative Law Judge (ALJ) assigned to the hearing granted the proposed amendment over the protest of one of the petitioners.

On April 11, 1978 the ICC published ICG's amended system diagram map which identified only the 26.5 mile segment between Mason City and Ashland as the subject of the pending abandonment application. 43 Fed.Reg. 15212, 15216. Three days later the ALJ issued his initial decision finding that the public convenience and necessity permitted the abandonment of the 26.5 mile segment of railroad.

Petitioners appealed the ALJ's decision. Division 1 of the ICC adopted the ALJ's findings and conclusions with minor modifications and denied petitioners' objections. In a decision dated January 31, 1979 the entire ICC denied the petitions for review.

This appeal followed.

## II.

Petitioners contend that the ALJ did not have authority to permit the amendment by

ICG of its abandonment application. Petitioners point to an ICC regulation effective at the time of this application [3] governing Subpart C applications, 49 C.F.R. § 1121.35 (1976 ed.), which provided in pertinent part:

> Partial withdrawal. Where there is significant and material public objection as to only a part of the line being proposed for abandonment, the applicant, with the consent of the protestants, may request that, that part of the application be withdrawn, and that a certificate be issued permitting abandonment of the remainder of the line sought to be abandoned.

While petitioners concede that ICG's application was filed under Subpart B, not Subpart C, they contend that the absence of an explicit amendment provision under Subpart B, and the Subpart C provision precluding amendment without consent of protestants mean that no amendment is permitted consistent with ICC regulations for Subpart B applications. We disagree.

■ The ICC Rules of Practice permit amendments to any "pleading" in the discretion of an "officer." 49 C.F.R. §§ 1100.-18, 1100.66(a). The term "pleading" is defined to include an application, *id.* § 1100.5(e), and the term "officer" is defined to include an administrative law judge, *id.* § 1100.5(g). Thus, as a general matter, amendments to applications are permitted in the discretion of an ALJ.

■ Amendments to Subpart C abandonment applications, however, are only permitted with the consent of protestants. Subpart C is a short form application to be utilized when the applicant does not anticipate significant and material objection. If there is no significant objection to the application, the ICC does not require that the

---

any such line (hereafter referred to as 'discontinuance'), unless such abandonment or discontinuance is described in and covered by a certificate which is issued by the Commission and which declares that the present or future public convenience and necessity require or permit such abandonment or discontinuance.
The Interstate Commerce Act was codified recently by Pub.L. 95–473, 92 Stat. 1337 (1978).

Citations in this opinion are to the original Title 49 with parenthetical notation of the recent codification.

**3.** The relevant sections of 49 C.F.R. have been amended since the time of this application. The parties agree that, for this purpose, the ICC regulations existing at the time of the application control.

voluminous material normally required be submitted with an abandonment application. If it later turns out that there is objection to the Subpart C short form application, the applicant has three options. It might (1) dismiss the application, 49 C.F.R. § 1121.35(c)(1) (1976 ed.), (2) withdraw the application and file a long form application under a different Subpart, *id.* § 1121.-35(b)(1); or (3) where there was objection to only a part of the line proposed for abandonment, the applicant could, with the consent of the objectors, request withdrawal of that part and request that a certificate permitting abandonment under Subpart C for the remainder of the line be issued, *id.* § 1121.35(a). *See Commonwealth of Pennsylvania v. United States*, 361 F.Supp. 208 (M.D.Pa.), *aff'd*, 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973).

Only in the special situations when an application is made under Subpart C (which is available only where objections are light) is consent of objectors necessary for an amendment. Regulations governing Subpart B abandonment applications did not explicitly or implicitly require consent for an amendment.[4] We believe that the special procedure under Subpart C requiring consent for an amendment is limited to Subpart C abandonment applications. Nothing suggests this amendment requirement had any greater effect. This provision does not suggest that the general amendment procedures of the ICC Rules of Practice did not apply to Subpart B abandonment applications. Simply, the Subpart C requirement of consent of protestants does not apply to this application.

### III.

Petitioners also argue that the ALJ's decision to permit amendment of the aban-

donment application violated the system diagram requirement of the Railroad Revitalization and Regulatory Reform Act (4–R Act). 49 U.S.C. § 1a(5) (now codified as 49 U.S.C. § 10904(d)(2)), requires that a railroad shall publish and maintain a system diagram map of its proposed abandonments updating it with such amendments as are necessary to maintain the map's accuracy. Since ICG did not amend its system diagram map until April 11, 1978, more than three months after its amendment was granted, and only three days before the certificate of abandonment was issued, petitioners contend ICG violated the 4–R Act and deprived the People of Illinois of proper notice.

■ We first note that neither 49 U.S.C. § 1a(5) nor its regulations apply to abandonment applications which were filed and pending before the ICC prior to promulgation by the ICC of regulations concerning a system diagram of the applicant's transportation system. 49 U.S.C. § 1a(8) (amended 1978). The ICC promulgated system diagram regulations on November 4, 1976, to be effective November 1, 1976. Since ICG's abandonment application was filed on October 27, 1976, prior to the effective date of the regulations, the system diagram regulations are not applicable to this application.

■ ICG, however, did move to amend its abandonment application to reduce the line proposed for abandonment from 42 miles to 26.5 miles on December 2, 1977, after the effective date of the regulations. The ALJ granted this amendment on January 4, 1978. Petitioners contend that the failure of ICG to update its system diagram map[5] to reflect this amendment violated the 4–R Act and the regulations promulgated under it.[6] We disagree.

4. Subpart B was another short form application procedure. Subpart B procedures were available to a railroad wishing to abandon lines "where the requirements of public convenience and necessity [for continuation of the line] are minimal or nonexistent." *Commonwealth of Pennsylvania v. United States*, 361 F.Supp. at 213.

5. ICG voluntarily filed a system diagram map on April 1, 1977. The ICC published this map on May 5, 1977.

6. The system diagram regulation promulgated under the 4–R Act is 49 C.F.R. § 1121.23. 49 C.F.R. § 1121.23(a) provides:

(a) Each carrier shall be responsible for maintaining the continuing accuracy of its system diagram map and the accompanying

Assuming for the purposes of argument that the ICC system diagram regulations promulgated under the 4–R Act apply to the ICG amendment because of ICG's action to comply with them by filing a system diagram map on April 1, 1977, after the effectiveness of the regulations, we find that the abandonment of the 26.5 mile segment without an updating of the system diagram map to reflect that the 15.5 mile southern segment was no longer subject to abandonment was consistent with the regulations. 49 C.F.R. § 1121.23(a) provides that a carrier is responsible for maintaining the continuing accuracy of its system diagram map and descriptions of individual lines for which abandonment is sought. The regulation does not specify, however, a time within which the system diagram map must be updated. The purpose of the regulation—to inform potential protestants of a proposed abandonment [7]—suggests that there is a duty to update the system diagram map in sufficient time to avoid harming potential protestants.[8]

Given the circumstances of this case we do not find that the failure to update the system diagram map within three months of the amendment served to harm potential protestants. ICG's amendment did not expand the trackage proposed for abandonment; it narrowed the proposed abandonment by removing the southern 15.5 miles from consideration. All protestants of the abandoned northern 26.5 miles were informed that their line was subject to abandonment. They had an opportunity to protest this abandonment. The failure to update the system diagram map to reflect the amendment did not prejudice the protestants' opportunity to respond.

Petitioners contend that potential protestants were prejudiced by the failure to update the system diagram map because the protestants of abandonment of the northern 26.5 mile segment may have relied on arguments by those protesting abandonment of the southern 15.5 mile segment, and thus some protestants may not have appeared to protest. This reliance, petitioners contend, resulted from the failure to update the system diagram map.

Petitioners' argument overlooks the fact that section 1(20) of the Interstate Commerce Act, 49 U.S.C. § 1(20) (now codified as 49 U.S.C. § 10903(b)), provides that the ICC may approve an abandonment application with modifications. Potential protestants to abandonment of the northern segment should have anticipated that the ICC would modify the original application and thus, their opposition would be needed. They should not have relied on arguments by those opposed to abandonment of the southern segment. Potential protestants had an adequate opportunity to state their objections, see *American Frozen Food Institute v. Train*, 176 U.S.App.D.C. 105, 132–33, 539 F.2d 107, 134–35 (D.C.Cir. 1976); *South Terminal Corp. v. Environmental Protection Agency*, 504 F.2d 646, 656–59 (1st Cir. 1974), and thus were not prejudiced by the failure to update the system diagram map to reflect the fact that only the 26.5 mile northern segment was then subject to abandonment.

█ Petitioners next contend that the grant of the abandonment application was

---

line descriptions. Each carrier shall also prepare and submit to the Commission a black-and-white version of the system diagram map and accompanying line descriptions which clearly identify each of these categories of line and are suitable for publication in the FEDERAL REGISTER, in accordance with Appendix A. Amendments may be filed at any time and will be subject to all carrier filing and publication requirements of § 1121.22 as they apply to the amendment and each individual line which has been amended.

7. The Senate Conference Report to the 4–R Act states the purpose of requiring a system diagram map. It provides in part: "In order to facilitate timely notice that service on any individual line may be in jeopardy, the bill requires each railroad to submit to the ICC a diagram of its system identifying any lines that are 'potentially subject to abandonment.'" S.Conf.Rep. No. 94–595, 94th Cong., 2d Sess. 133, 142, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 148, 157.

8. 49 C.F.R. § 1121.23(c) requires in any event that a system diagram map be updated on an annual basis.

improper because of the failure to satisfy the four-month requirement of 49 C.F.R. § 1121.23(d).[9] Section 1121.23(d) precludes the issuance of a certificate of abandonment unless the line involved is identified and described in a system diagram map for four months prior to the filing of the application. Here, the application was filed prior to the effectiveness of section 1121.23(d), and there is no indication that the ICC voluntarily applied the section retroactively, so the regulation does not apply to the original application. Under the circumstances of this case the amendment to the application does not affect our analysis. We do not believe that section 1121.23(d) requires a new running of the four-month period if the line involved was properly identified in accordance with ICC regulations in effect at the time of the original application. To require a new running of the four-month period every time an amendment which does not expand the line proposed for abandonment is granted is inconsistent with the purpose of section 1121.-23(d). *See* note 7 *supra.* Since there is no contention that potential protestants were not informed of the original abandonment application in accordance with ICC notice requirements in effect at the date of the application and since the amendment only narrowed the track for which abandonment was sought, protestants were properly informed of the abandonment. The amendment did not create an obligation to comply with the four-month requirement.

**9.** 49 C.F.R. § 1121.23(d) provides:

> (d) Under section 1a(5)(b) of the Act, the Commission is precluded from issuing a certificate of abandonment or discontinuance if the abandonment or discontinuance application is opposed by a significant user, a State, or a political subdivision of a State unless the line involved is identified and described on the system diagram map for at least 4 months prior to the filing of such application. The 4-month minimum notice period of section 1a(5)(b) will be deemed to have commenced only for a line or portion of a line which is designated on the carrier's system diagram map as a line in category 1 (§ 1121.-20(b)(1)).

## IV.

Petitioners next claim that the ICC erred in failing to take into account the effect of abandonment of the northern 26.5 mile segment on the southern 15.5 mile segment, for which abandonment was originally sought when it determined the public convenience and necessity. They argue that abandonment of the northern segment will reduce the profitability of the southern segment [10] and thus the ICC was obliged to consider the adverse effects on the southern segment.

The ALJ considered this argument and stated:

> In the first instance this portion [the southern segment] of the applicant's line was not at issue and perhaps more significant is the fact that protestants presented no evidence which would demonstrate any adversity a grant of the application would have on this segment of the line. To place the burden on applicant to show this adversity is akin to placing the absurd burden on applicant to demonstrate adversity on any other part of its system through a grant of the proposed abandonment.

*Illinois Central Gulf Railroad Company Abandonment Between Mason City and Ashland, Ill.,* No. AB–43 (Sub-No. 31) at 13 (March 29, 1978) (decision of the Administrative Law Judge). In separate opinions Division 1 of the ICC and the entire Commission adopted the findings and conclusions of the ALJ with minor modifications.[11]

**10.** Petitioners contend that the southern segment will lose bridge traffic revenue, that is revenue from traffic which now moves over the southern segment to reach the northern segment.

**11.** With regard to the issue of consideration of the effect of abandonment of the northern segment on the southern segment, the ICC decision stated:

> The decision of the Administrative Law Judge to allow amendment of the application prior to hearing has not prejudiced protestants' case. A review of Commission policy does not suggest any basis for restricting this proceeding to the entire portion of trackage originally proposed for abandonment. If the railroad subsequently seeks to abandon the

We find the ALJ's decision as modified by the ICC dispositive of this issue.

 The ALJ did consider the impact of the abandonment of the 26.5 mile northern segment on the rest of ICG's system. When the ALJ balanced the interests required of him in an abandonment proceeding by *Colorado v. United States*, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926), he specifically included off-branch revenues resulting from the operation of the 26.5 mile segment to be abandoned. *Illinois Central Gulf Railroad Company Abandonment Between Mason City and Ashland, Ill.*, No. AB–43 (Sub-No. 31) (March 29, 1978) (ALJ decision), Apps. B & C. This includes a consideration of the revenue which would be lost to the entire ICG system, if this branch were abandoned. 49 C.F.R. § 1121.-41. Since the southern segment, for which abandonment was originally sought, is part of the entire ICG system, the loss of bridge revenue caused by the abandonment of the northern segment on the southern segment was considered.

The ICC was under no further obligation to specially consider the effect of abandonment of the northern segment on the southern segment. After the grant of the amendment the only issue before the ICC was the abandonment of the northern segment. ICG had no present plans to abandon the southern segment. The ICC did not have to foresee ICG's future intentions regarding the abandonment of the southern segment when passing on the abandonment of the northern segment.[12] To require the ICC to specially consider the effect of this abandonment on a proposed future abandonment of a neighboring segment would be inconsistent with ICC precedent, *Southern Pacific Transportation Company Aban-*

donment, 360 I.C.C. 138, 141 (1979); *Chicago & North Western Railway Company Abandonment*, 295 I.C.C. 31, 38–39 (1955); (*cf. American Trucking Associations, Inc. v. United States*, 326 U.S. 77, 82–83, 65 S.Ct. 1499, 1501, 89 L.Ed. 2065 (1945), and something this court will not do.

 The final argument that petitioners make is that public convenience and necessity does not permit abandonment of the 26.5 mile segment between Mason City and Ashland, Illinois. Reviewing the record we find substantial evidence to support the ICC's decision, and thus find the abandonment was proper.

Accordingly, the petition for review is denied.

PETITION DENIED.

---

portion of the trackage that was deleted by the amendment, the Commission at that time will weigh the public interest against the concerns of the railroad in arriving at a decision. The amendment will not serve to help or harm the railroad in subsequent abandonment proceedings. *Illinois Central Gulf Railroad Company Abandonment Between Mason City and Ashland, Ill.*, No. AB–43 (Sub-No. 31) at 4 (October 30, 1978) (decision of the ICC). The ICC did not question the ALJ decision; it only added the further conclusion that the grant of the proposed abandonment would not help or harm the railroad in future abandonment proceedings.

12. In fact, ICG amended its system diagram map to exclude the southern segment from consideration for abandonment, indicating no present intent to abandon the southern segment.