**INDIANA SUGARS, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, et al., Respondents.**

**Patrick W. SIMMONS, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, et al., Respondents.**

Nos. 82–1313, 82–1340.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1982.

Decided Dec. 10, 1982.

Rehearings and Rehearings En Banc Denied Feb. 8 and Feb. 17, 1983.

Leonard R. Kofkin, Chicago, Ill., Gordon P. MacDougall, Washington, D.C., for petitioner.

Ellen D. Hanson, I.C.C., Washington, D.C., Angelica D. Lloyd, Norfold & Western R.R. Co., Roanoke, Va., for respondents.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and DUMBAULD,* Senior District Judge.

DUMBAULD, Senior District Judge.

The current passion for "deregulation" prevalent in governmental circles [1] has not completely eliminated all restrictions upon the freedom of action of common carriers by rail subject to the jurisdiction of the Interstate Commerce Commission.[2] Among the restrictions still remaining in effect is the provision of 49 U.S.C. 10903(a) that a rail carrier may abandon any part of its railroad lines or discontinue operation thereover "only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." The burden of proof on this issue is placed upon the carrier by 49 U.S.C. 10904(d)(1).[3]

In the case at bar the Wabash Railroad Company (Wabash) and Norfolk and Western Company (N. & W.) filed an application to abandon 42.89 miles of trackage in Indiana, formerly part of the Wabash system but now leased to N. & W.[4] The Commission granted the application, over the protest of appellant Indiana Sugars, Inc. Its plant is located in the Gary, Indiana, area, approximately seven miles from the Illinois line, and is served out of Chicago. There is no opposition to abandonment east of Gary.

Indiana Sugars depends upon rail service over the seven miles involved for inbound movement of bulk sugar in carload lots originating in California, Utah, and Minnesota. Over half of protestant's inbound traffic uses the trackage proposed to be abandoned. Over half of the service over this trackage is traffic to or from protestant's plant. Over 700 cars annually move to or from protestant's plant. Petitioner in No. 82–1340, Patrick W. Simmons, was also a protestant in the proceedings on behalf of railroad labor unions. One crew would be eliminated. The normal turning point for the train serving the Indiana Sugar plant is between mileposts 239 and 241.1.

The standard of review in abandonment cases was recently discussed by this Court in *People of the State of Illinois v. U.S.*, 666 F.2d 1066, 1071–73 (7th Cir.1981), where the "arbitrary and capricious" standard was applied. See also *Concord Twp. et al. v. U.S.*, 625 F.2d 1068, 1072 (3rd

---

* The Hon. Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. *North American Van Lines, Inc. v. I.C.C.*, 666 F.2d 1087, 1089–90 (7th Cir.1981).

2. Thus rail rates must still be reasonable, but only if the railroad "has market dominance over the transportation" to which the rate applies. 49 U.S.C. 10701a(b)(1). Discrimination is still forbidden. 49 U.S.C. 10741. Proof of "public convenience and necessity" is still required for extension of lines. 49 U.S.C. 10901(a).

3. Of course a carrier cannot constitutionally be compelled to carry on its business at a loss, as Justice Holmes pointed out long ago. *Brooks-Scanlon Co. v. R.R. Comm. of La.*, 251 U.S. 396, 399, 40 S.Ct. 183, 184, 64 L.Ed. 323 (1920).

4. The application covered 42.89 miles of track from Clarke Junction, Indiana (milepost 246.63) east to Dillon, Indiana (milepost 203.74). The application also covered service over 5.77 miles of trackage rights over the B. & O. Chicago Terminal Railroad Company between Clarke Junction (milepost 246.63) and State Line Junction (milepost 252.4).

Cir.1980). The distinction between the "arbitrary and capricious" standard and the "unsupported by substantial evidence" standard is largely academic where the two tests overlap,[5] since a decision without substantial evidence to support it is *eo ipso* arbitrary and capricious. *Thompson v. Louisville,* 362 U.S. 199, 204, 80 S.Ct. 624, 628, 4 L.Ed.2d 654 (1969); *Garner v. Louisiana,* 368 U.S. 157, 163–64, 82 S.Ct. 248, 251–52, 7 L.Ed.2d 207 (1961).

■ The interests of the public in continued service and of the carrier in avoiding financial loss are to be weighed by the Commission. *Colorado v. U.S.,* 271 U.S. 153, 168–69, 46 S.Ct. 452, 455–56, 70 L.Ed. 878 (1926) [Brandeis, J.]; and as stated by Judge Learned Hand in *U.S. Feldspar Corp. v. U.S.,* 38 F.2d 91, 95 (N.D.N.Y.1930), a shipper "may not insist upon the maintenance of a burdensome line solely for its own benefit; the conflict of interests so arising is precisely the kind of question which the Commission is set up to solve." The traditional limitations upon a reviewing court's authority over determinations entrusted by law to the Commission[6] remain in force[7] and illuminate the codification embodied in the Administrative Procedure Act, 5 U.S.C. 706(2).

The normal deference accorded by courts to the Commission expertise is probably intensified to some extent in abandonment cases by the trend of Congressional policy. Appellants assert that the Commission automatically grants all abandonment applications. This accusation is unwarranted, but in fairness to the Commission it should be noted that Congress has favored elimination of many routes in connection with Amtrak's passenger service, and reduction of the financial burden upon the Government in connection with railroad operations generally. In particular, with respect to abandonment Congress has established accelerated time limits for passing upon abandonment cases.[8]

Nevertheless it is clear that the Commission must adjudicate every application upon a case by case basis and consider with appropriate care the weight of the conflicting interests involved, as set forth by Justice Brandeis in *Colorado, supra.*

Particularly in an adjudicative proceeding, like abandonment (as distinguished from rule-making), the Commission must manifest a high degree of precision with respect to controverted issues. It must "clearly address the specific legal and factual issues raised." Conclusory formulations based upon *ipse dixit* are insufficient. A reasoned decision is required with full consideration of relevant factors, and free from clear errors of judgment. There must be an articulated rational connection between the facts found and the choices made. Judicial scrutiny, though narrow, must be "searching and careful," subjecting the administrative conclusion to "thorough, probing, in-depth review." *People of State of Illinois v. U.S., supra,* 666 F.2d at 1073, and authorities there cited. The reviewing court must not accord automatic "rubber stamp" approval to the Commission's conclusions.

■ Upon careful consideration of the circumstances of the case at bar we conclude that the Commission did act "arbitrarily and capriciously" by failing to focus greater attention upon the serious need for rail service by the shipper using the service to be discontinued, and to calculate and

---

5. A decision might be found "arbitrary and capricious" upon grounds unrelated to evidentiary support (*e.g.* if conflict of interest or corruption were proved).

6. For a review of the case law as to scope of review see *Pgh. & New England Trucking Co. v. U.S.,* 345 F.Supp. 743, 747 (W.D.Pa.1972).

7. In *State of Maine Dept. of Transportation v. I.C.C.,* 587 F.2d 541, 543 (1st Cir.1978) the court followed the traditional criteria.

8. In case of a protest requiring investigation, an initial decision must be rendered within 165 days after the application is filed, and a final decision on appeal within 255 days, 49 U.S.C. 10904(c)(3). The Commission characterized these expedition requirements as "severe time constraints." *Abandonment of Railroad Lines and Discontinuance of Service* 365 I.C.C. 249, 250, 253 (1981).

compare with greater precision the degree of financial loss which the carrier would suffer if service were to continue to be provided.

The long-haul movement of bulk sugar from West Coast points in carload quantities is a vital component of the business operations of Indiana Sugars. To lose rail service for so substantial a segment of its inbound traffic would inflict serious hardships upon the company.

This is the type of traffic which normally should move by rail rather than other forms of carriage under the provision of the National Transportation Policy which is still in force under 49 U.S.C. 10101(a)(1) and calls for regulation recognizing and preserving "the inherent advantage of each mode of transportation." Use of motor transportation would under most favorable conditions require transfer of lading, which would be undesirable, burdensome, and perhaps unsanitary in the case of a food product. There has been demonstrated a genuine and substantial need for long haul, carload rail service for this commodity, of which Indiana Sugars uses a large quantity regularly in its business operations.

The showing of available alternative rail or motor transportation which the Commission accepted as adequate was extremely unpersuasive.

Continuance of rail service over other routes would require purchase of a substantial segment of rail line by the shipper and establishment of interconnecting switching facilities. While industrial side-track agreements often require the shipper to bear certain expenses in connection with the siding, no evidence was offered to show that it is customary or reasonable for shippers to engage in railroad operations so extensively as would be required here in order to make an alternative rail route available. The prospect of alternative rail service is entirely speculative and unsupported by convincing evidence.

The evidence in support of adequate motor carrier service was likewise insufficient and unpersuasive. The available service might be described as "paper service" by analogy to the familiar expression "paper rates" to describe published tariff rates pursuant to which no traffic actually moves. There was no convincing demonstration that satisfactory long haul transportation was available, without transfer of lading, or that any motor carriers were in a position to provide the necessary volume of equipment to handle this traffic, amounting, as previously noted, to more than half of protestant's inbound traffic, and which because of its volume and transportation characteristics is more suitable for transportation by rail in any event.

Under these circumstances we hold that the Commission should have considered the revenue/expense data for the seven mile movement which would have sufficed to serve the plant of Indiana Sugars. We agree that bifurcation of an abandonment application is not mandatory; but where, as here, serious shipper need is established, and there is no opposition to abandonment of the remaining 36 miles of the rail line involved, bifurcation was essential in order to develop the genuine issue for decision.

The facts of the case at bar manifested an appropriate occasion for exercise of the Commission's discretion to deal with the genuine problem rather than to dilute it with irrelevant data. Inasmuch as much of the carrier's asserted avoidable loss in the instant case involved rehabilitation and opportunity costs (only one train crew being used on the line), it is obvious that the genuine costs of continued operation of a 7 mile line might be substantially less than those for a 42.89 mile line, where admittedly no service beyond the Indiana Sugars plant deserved serious consideration. And a substantial discrepancy in the cost of service figures might materially affect the conclusion reached when weighing the respective advantages and hardships to the public and to the railroad resulting from abandonment *vel non* of the line involved.

The statute, as has been seen, places the burden of proof in an abandonment case squarely upon the applicant railroad. Regardless of rules designed to promote administrative convenience and presumptions

regarding the burden of going forward with evidence, the ultimate burden of proving the justification of an abandonment under the applicable statutory test of public convenience and necessity rests with the carrier.

The rule of thumb that if an applicant proves his case for abandonment of X miles of road, he has thereby *eo ipso* also proved the justification for abandonment of the lesser included distance of X–Y miles, is nothing more than a mathematical rule of logic. If in fact the relevant properties of X and Y differ substantially (like apples and oranges) a more precise consideration of the specific issues involved may be required in order to develop a record sufficient to support, as a matter of law, a reasonable and well-informed decision. It would be error of law in such a case to hold that the burden of proof rests upon the protestant, although that formulation might suffice to explain the results in many run of mine cases. But the ultimate burden of proof has been placed unmistakably upon the applicant by Congress.

Although the initial choice with respect to the scope of its application rests with the applicant, when in the course of proceedings it becomes clear that the real issue in controversy relates to a more specific subject-matter, it would be arbitrary to neglect the controlling issues by reliance upon irrelevant generalities. We are confident that the data-processing capabilities of the railroad companies involved will be able to segregate the relevant data from their records without undue burden, and concentrate the production of evidence upon the decisive areas in controversy.

Accordingly, we affirm the Commission's decisions of January 11, 1982, and April 6, 1982, with respect to the unopposed abandonment of the approximately 36 miles of track east of Gary, but remand to the Commission for full hearing and consideration *de novo* the proceeding insofar as it concerns the approximately 7 miles of track and 5.77 miles of trackage rights serving the plant of appellant Indiana Sugars, Inc.

PETITION FOR REVIEW DENIED IN PART AND GRANTED IN PART.